**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAROL GRUNEWALD
5305 28th Street NW
Washington, DC 20015,

JEREMY RIFKIN
5305 28th Street NW
Washington, DC 20015,

ANNE BARTON
5407 32nd Street NW
Washington, DC 20015,

MARY ROWSE
3706 Morrison Street NW
Washington, DC 20015,

ZHONG-YING CHEN
5401 32nd Street NW
Washington, DC 20015,

IN DEFENSE OF ANIMALS
3010 Kerner Blvd.
San Rafael, CA 94901,

Plaintiffs,

v.

JONATHAN B. JARVIS, Director
National Park Service
1849 C Street, NW
Washington, DC 20240,

KENNETH SALAZAR, Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

Defendants.

Civ No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This suit challenges a decision by the National Park Service ("Park Service") to kill hundreds of white-tailed deer in Rock Creek Park – the first time the agency has allowed the killing of *any* wildlife in this Park since it was established in 1890. This unprecedented and extreme approach to reducing the population of native wildlife that, according to the Park Service's own data, has remained relatively stable for at least ten years and decreased in many years under natural conditions without any human interference, is unwarranted, particularly when NPS also concedes that the deer pose no urgent threat to the Park or any of its resources. By adopting this arbitrary and dramatic approach to managing this native wildlife, and failing to consider the impact of turning what for over 120 years has been a tranquil oasis of wildness in the middle of our nation's capital into a killing field will have on the character of this special place and the ability of local residents and visitors to continue to enjoy it, the Park Service has violated the statutes that established Rock Creek Park, 51st Cong. § 7 (1st Sess. 1890), and the National Park Service, 16 U.S.C. § 1, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-706.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

**PARTIES**

3. Plaintiff Carol Grunewald lives approximately one block from Rock Creek Park, and her home is surrounded by the Park on two sides. She and her husband chose their home over twenty years ago because of its proximity to the Park and their ability to enjoy its solitude and the wildlife that live there. She regularly walks, hikes, and rides her bicycle in the Park. She very much enjoys seeing deer in the Park, some of whom she also sees in her neighborhood and

yard. Over the years, she learned to recognize deer, particularly those who were born near her home. Because of her concern for the well-being of these animals, she submitted extensive comments to the Park Service about its proposed management of deer, and she attended several public meetings in which she testified against lethal control and urged the Park Service instead to use less drastic means to reduce the deer herd, such as contraception.

4. Luring the deer to bait stations at night to shoot them with guns and crossbows – as the Park Service currently plans to do – will significantly harm Ms. Grunewald's aesthetic and recreational interests in the wildlife and the Park in general because she knows that some of the deer she enjoys observing will be killed, and worse, that some will suffer painful wounds from gunshots and arrows before dying. If the Park Service proceeds with its plans to kill deer in the Park, Ms. Grunewald will need to stop using the Park to minimize the chance that she will see dead or dying deer and because it will no longer be a place of solitude and tranquility, but instead will cause her great anxiety and distress – knowing that the animals she has grown to love are being maimed and killed. For the same reasons, she may actually have to sell her home where she has lived for over twenty years and relocate to an area that is nowhere near Rock Creek Park. Her aesthetic injuries will be redressed if she prevails in this action because the Park Service will need to use less drastic means of controlling any perceived overpopulation of deer.

5. Plaintiff Jeremy Rifkin is an author and the founder and president of the nonprofit organization the Foundation on Economic Trends. He has decades of experience studying and writing about the natural environment and ecological sustainability. He has used Rock Creek Park regularly since he moved to Washington, DC in 1970, and he now lives in a home near the Park with his wife Carol Grunewald. He uses the Park in all four seasons for hiking, bicycling, dog-walking, visiting the stables, and enjoying solitude. During these visits, he regularly

observes birds, foxes, squirrels, and white-tailed deer. The deer are his favorite. He particularly appreciates that the deer population has never been artificially "managed" by hunting. He submitted comments to the Park Service in 2009, in which he opposed killing the deer in light of less invasive alternatives that exist to reduce any perceived overpopulation, and he specifically raised concerns that the killing of this wildlife will destroy the tranquility of the Park.

6.   If the Park Service kills the deer in Rock Creek Park, this will undermine Mr. Rifkin's ability to enjoy the Park by compromising its aesthetic value and causing him emotional and psychological distress. He would almost certainly stop using Rock Creek Park to hike, walk, bike, or visit the stables. Mr. Rifkin's injuries will be redressed if he prevails in this action because the Park Service will need to use less drastic means of controlling any perceived overpopulation of deer.

7.   Plaintiff Anne Barton has lived at her current address approximately three blocks from the park for thirty-six years. She uses the Park for walks, birding, and picnics with family and friends, and very much enjoys driving through the Park. She greatly appreciates the Park's quiet and solitude, and enjoys observing, photographing, and painting the Park's wildlife that come into her backyard, including deer. She submitted comments on the Park's proposal to control the deer, in which she opposed lethal control as a means of reducing the population.

8.   The Park Service's plan to kill hundreds of deer by sharpshooting and crossbow will injure Ms. Barton's recreational, aesthetic, and artistic interests in observing this wildlife in the Park and in her backyard. She is particularly concerned that a fawn she observed being born in her yard in 2004 will be killed by this action. If the action proceeds as planned, she would likely stop photographing and painting deer, and would also likely stop using Rock Creek Park altogether. There is no question that her ability to enjoy the Park will be severely impaired. Ms.

Barton's injuries will be redressed if she prevails in this action because the Park Service will need to use less drastic means of controlling any perceived overpopulation of deer.

9. Plaintiff Mary Rowse moved to Washington, DC in 1960 and has been a resident since then, using the Park continually over the past fifty-two years. As a child, she picnicked in Rock Creek Park and attended camp there. In the evenings, her family drove through the Park to cool off on hot summer nights because they did not have air-conditioning. Thirty-two years ago, she moved to her current residence in the Chevy Chase neighborhood of Washington where she greatly appreciates her close proximity to the Park. She regularly uses the Park and enjoys observing deer along Rock Creek Parkway, Military Road, Oregon Avenue, and Bingham Drive. She appreciates the presence of wild deer in an urban park as an extraordinary treasure. Ms. Rowse views the Park as a sacred, contemplative place and derives great aesthetic pleasure knowing that the deer that live there are safe from being hunted. She was horrified to learn of the Park Service's plan to kill the deer, which will have a dramatic adverse effect on her ability to use and enjoy the Park. Her injuries will be redressed if she prevails in this action because the Park Service will need to use nonlethal means of controlling any perceived overpopulation of deer.

10. Plaintiff Zhong-Ying Chen has lived three blocks from Rock Creek Park since 1993, and very much appreciates his home's proximity to nature. He often visits the Park's stable and Nature Center with family and out-of-town visitors, and he enjoys seeing deer and other wild animals when he walks through the Park on the weekends. He chooses to drive through the Park whenever he goes downtown or to Virginia because he loves the scenery, fresh air, and special ambiance of the Park – especially given its location inside a busy capital city. He submitted comments on the deer management for Rock Creek Park on several occasions,

beginning in 2009, expressing his belief that a national park in the nation's capital should set an example of humane treatment of wildlife, particularly given the success of nonlethal reproductive control of deer in other places, including the National Institute of Standards and Technology in Gaithersburg, Maryland, and Fire Island National Seashore in New York. If the Park implements its plan to kill deer, Dr. Chen will no longer be able to enjoy using the Park as he does now. His aesthetic and recreational injuries will be redressed if he prevails in this action because the Park Service will need to use less drastic means of controlling any perceived overpopulation of deer.

11. Plaintiff In Defense of Animals ("IDA") has protected the rights, welfare, and habitats of animals since 1983. IDA is pro-science, pro-environment, pro-animal, and pro-people; it is committed to dialogue and reason, but does not hesitate to take action when necessary to save animals from mistreatment, torture, and killing – including through litigation, policy, and other advocacy. IDA has tens of thousands of members and supporters throughout the country, including dozens of members in the metropolitan Washington DC area. IDA successfully stopped a deer kill at Binghamton University in New York in 2011, and has assisted the communities of Hastings, New York, and Catalina Island, California, in implementing humane reproductive controls to reduce deer and bison numbers.

12. IDA brings this case on behalf of its members and staff who regularly use Rock Creek Park for walking, bicycling, observing wildlife, picnicking, photography, and quiet contemplation, and who enjoy viewing white-tailed deer in the Park. They will no longer be able to enjoy the Park in the same way if the Park Service kills the deer using high-powered rifles and crossbows. These aesthetic and recreational injuries will be redressed if IDA prevails in this

action because the Park Service will need to use less drastic means of controlling any perceived overpopulation of deer.

13.     Defendant Jonathan B. Jarvis is the director of the National Park Service, which is an agency of the United States under the Department of the Interior, and is charged with managing the federal lands and resources of Rock Creek Park, in accordance and compliance with federal laws and regulations.

14.     Defendant Kenneth Salazar is the Secretary of the Interior and has ultimate responsibility for the decision of the National Park Service.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The Rock Creek Park Enabling Act

15.     Rock Creek Park was established over 120 years ago.  A United States senator from Missouri first proposed a park along Rock Creek in 1867 to be an oasis in the nation's capital that would help ease the worries of his fellow statesmen and their constituents who had experienced the "wear and tear of such life as this, who have all their energies run to brain, and all their souls fused into politics."  Park Service, Administrative History of Rock Creek Park, http://www.nps.gov/rocr/ historyculture/adhi.htm (quoting 37 Congressional Globe 1578).

16.     Twenty-two years later, civic leaders again took up the cause of an urban oasis in the nation's capital and rode through the Rock Creek valley on Thanksgiving Day to support the Park's establishment.  Id.  The next year, in 1890, on the same day that Sequoia National Park was established in California, Congress enacted legislation establishing Rock Creek Park.  Rock Creek Park Enabling Act, 51st Cong. § 7 (1st Sess. 1890).

17.     The Park's enabling act charged the Commissioners of the District of Columbia and the Army Corps of Engineers to "care and manage[]" the Park, and mandated that any such

management "preserv[e] from injury or spoliation of all timber, animals, or curiosities within [the] park, and their retention in their natural condition, *as nearly as possible*." 51st Cong. § 7.

**B. The Organic Act Establishing The National Park Service**

18. In 1916, Congress established the National Park Service to "promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . by such means and measures as conform to the fundamental purpose . . . to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

19. In 1933, Rock Creek Park was placed under the jurisdiction of the National Park Service. However, the Park Service must administer the Park in accordance with the provisions concerning its establishment in 1890. 16 U.S.C. § 1c(b).

**C. The National Environmental Policy Act**

20. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. It was enacted to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." Id. § 1500.1(b)-(c).

21. To accomplish these objectives, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), including situations where several separate actions may have a cumulatively significant impact on the environment. 40 C.F.R. § 1508.27(b)(7).

22. This statement – known as an Environmental Impact Statement ("EIS") – must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  42 U.S.C. § 4332.

23. NEPA's implementing regulations define "environmental effects" to include the "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), *aesthetic*, historic, cultural, economic, social, or health" aspects of a decision, "whether direct, indirect or cumulative."  40 C.F.R. § 1508.8 (emphasis added).  In an EIS, agencies must "rigorously explore and objectively evaluate" the effect of each alternative on the "human environment," which is defined as "the natural and physical environment and *the relationship of people with that environment*."  Id. § 1508.14 (emphasis added).  Agencies must also make "diligent efforts to involve the public in preparing and implementing their NEPA procedures," including providing public notice and soliciting public comment.  Id. § 1506.6.

24. At the time of its decision to take a proposed action, the agency must prepare a concise public record of decision ("ROD") that identifies all reasonable alternatives and states "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  Id. § 1505.2.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

### A. Rock Creek Park

25. Rock Creek Park is an oasis of 4.69 square miles of trees, fields, and a meandering creek in the heart of Washington, DC. It is described by the Park Service as "the largest unbroken forest in the Washington metropolitan area, providing habitat for much of the city's wildlife and acting as an important contributor to the region's biodiversity." ROD at 17. Approximately 2 million people visit the Park each year, many of whom are DC and Maryland residents who live near the Park and who go there to escape the noise, congestion, and stress of the city, and to enjoy the unique scenery, contemplative setting, and wildlife that live there.

26. The Park is home to an array of wildlife, including white-tailed deer, raccoons, red foxes, gray foxes, opossums, beavers, gray squirrels, chipmunks, dozens of bird species, and even coyotes. In 2009, the Park Service estimated that Rock Creek Park had approximately 67 deer per square mile, or 314 deer total.

27. Deer are herbivores. Their diet is comprised of twigs and tree buds, as well as non-woody plants and fruits. When food is plentiful, deer tend to have twins and even triplets. When food is scarce, they have single fawns or stop reproducing altogether. The deer in Rock Creek Park do not show signs of malnutrition, and the Park Service describes the general appearance of the herd as "relatively good." EIS at 114.

28. In areas where deer populations are high, the impact of a potential overpopulation problem can be detected by what is called a "browse line" in the habitat, which graphically demonstrates the height at which the deer can reach the vegetation they consume. In these instances, shrubs and trees are denuded below the browse line, while foliage remains abundant above it.

29. According to the Park Service's own final Record of Decision, currently "the browse line is not prominent" in Rock Creek Park. ROD at 3.

30. Deer were once plentiful in North America, but were heavily exploited when Europeans settled the land. While the deer in Rock Creek Park have not rebounded to the levels that exist elsewhere – where densities can exceed 100 or 200 deer per square mile – they are common enough to contribute to the experience of visitors who come to the Park to escape the turmoil of the city and to appreciate a small piece of the natural wild.

**B. <u>Park Service's Draft Environmental Impact Statement</u>**

31. In July 2009, the Park Service prepared a draft EIS to "develop a white-tailed deer management strategy that supports the long-term protection, preservation, and restoration of native vegetation and other natural and cultural resources in Rock Creek Park." Draft EIS at 1. The Park Service stated that such action is needed to address the "*potential* of deer becoming" the dominant force in the Park's ecosystem, a decline in tree saplings, browsing impacts on shrubs and the Park's cultural landscapes, and "[o]pportunities to coordinate with other jurisdictional entities" that are killing deer. Draft EIS at 1-2.

32. Recognizing the deer as an "important park resource," the draft EIS acknowledged that the Park Service must "maintain a deer population in the Park . . . ." Draft EIS at 26.

33. The draft EIS considered four alternatives, two of which involved killing large numbers of deer, despite the fact that the Park Service did not articulate an immediate problem requiring such a drastic response. On the contrary, the draft EIS stated that "[a]n overabundance of deer *could possibly* alter and affect forest regeneration patterns," that "high deer densities *may* adversely affect plants and other wildlife species," that deer "have *the potential to* adversely

affect unique and important fish habitats," and that habitat for threatened and endangered species "*may* be vulnerable to impacts" from deer.  Draft EIS at 25-27 (emphases added).

34.     The draft EIS also demonstrated that, while deer density in the Park had varied over eight years, with estimates ranging between 52 to 98 deer per square mile, there was no evidence that the numbers of deer were increasing or would do so in the future.  See Draft EIS at 16.  In fact, the two lowest density estimates occurred in the three most recent years recorded in the draft EIS.  Id. (table showing estimates from 2000 to 2007, with the lowest figures – 52 and 58 deer per square mile – appearing in 2005 and 2006).

35.     The draft EIS discussed, but ultimately dismissed, two nonlethal alternatives.  The Park Service rejected Alternative A, which would have continued educational efforts and fencing to protect plants, because it would allow the deer density to "*gradually* increase with annual fluctuations."  Draft EIS at 166 (emphasis added).  As to Alternative B, the Park Service concluded that using sterilization and reproductive control to reduce the deer population, would "provide continued protection of certain areas of the Park over the long term, would meet the minimum of protecting 5% to 10% of the Park at any one time, and . . . could reduce deer numbers gradually over an extended period of time."  Draft EIS at 168-69 (citation omitted).  Nevertheless, the Park Service rejected this alternative on the ground that deer numbers would only be reduced "gradually over an extended period of time."  Draft EIS at 169.

36.     Alternatives C and D both identified a goal of reducing the deer population to 15 to 20 deer per square mile within three years, requiring the Park Service to kill deer – with a preference for does over bucks – until only 70 to 94 remain, after which time the Park Service would kill deer in lower numbers or use reproductive controls to maintain the deer population.  To accomplish this objective, both alternatives required luring deer at night with grain, apples,

and hay to locations in the Park where they would be shot at close range with high-powered rifles or, where the killing would occur close to people's homes, with crossbows and arrows. Draft EIS at 61-62; 67. The killing would primarily occur at night during the late fall and winter, but could occur during the day in areas that "would be closed to the park visitors." Draft EIS at 61. These alternatives also included netting or trapping deer and killing them using "a penetrating captive bolt gun," a device which penetrates the skull of the animal, enters the cranium, and catastrophically damages the cerebrum and part of the cerebellum, or "exsanguination," blood-letting to the point of death. Draft EIS at 62.

37. The deer bodies would be buried, removed, or left to decompose on the ground in the Park. Draft EIS at 200. The Park Service planned to donate meat from the deer to "local charitable organizations to the maximum extent possible." Draft EIS at 62.

38. The only significant difference between Alternatives C and D was the method of control after the first three years of killing. Alternative C proposed continued killing at lower levels, while Alternative D would shift to reproductive controls for this purpose.

39. The draft EIS acknowledged that "getting close enough to deer to administer remote injections [of reproductive controls] would become increasingly difficult *after sharpshooting efforts*" – because once the deer are subjected to being baited and killed for the first time, they will try to avoid humans as much as possible. Draft EIS at 67 (emphasis added).

40. Nevertheless, the Park Service identified Alternative D, which requires killing deer using a combination of high-power rifles and archery over a minimum of three years, as its "preferred alternative," and then shifting to reproductive controls as a means of managing the population.

41. Conceding that sharpshooting would adversely affect visitors' experience over the "long term," the draft EIS concluded that this adverse effect would be "negligible," because the killing would "primarily occur during fall and winter and at night" when fewer visitors use the Park. Draft EIS at 244.

42. The agency did not consider – at all – the overall negative impact this program would have on the aesthetic interests of those who love the deer and the peaceful character of this special place, and who greatly value the fact that the Park has never allowed killing wildlife in the past.

**C. Public Comment And The Park Service's Decision To Kill Deer In Rock Creek Park**

43. Public comments on the draft EIS overwhelmingly opposed killing the deer. Given the Park Service's admissions that there is no noticeable browse line and that the deer population has fluctuated over years on its own without any human interference, commenters questioned whether there is any "overpopulation" of deer that needs to be reduced through more aggressive management actions. In any event, they pointed out that effective reproductive controls were available to control any perceived problem. Indeed, the Humane Society of the United States proposed a reproductive control plan for the deer that was supported by local members of Congress, including Rep. Eleanor Holmes Norton (DC), Rep. James P. Moran (VA), and Rep. Chris Van Hollen (MD).

44. Commenters also raised concerns that the killing of the deer would seriously affect the local residents' and visitors' ability to enjoy this Park, especially when one of the methods of lethal control – archery – usually requires several shots before the animal finally bleeds to death. The public also expressed concern that even using rifles to kill the deer will

mean that not all of the targeted animals will be killed on the first shot and will suffer excruciating pain and terror. They also raised concerns that by killing deer the Park Service will violate its mandate to conserve the Park's "natural, native biotic community" without intervention.

45. Despite these comments, and the fact that Park Service's own estimates of deer densities were lower in 2008 and 2009 than in 2007 – the last year recorded in the draft EIS – the Park Service again identified Alternative D as its preferred alternative in the final EIS. See EIS at 16. Therefore, to reach a goal of 15 to 20 deer per square mile, the Park Service adopted a plan to lure deer with bait to locations where they will be shot at close range with high-powered rifles, or with crossbows where Park Service agents are killing deer "close to occupied buildings or residences." EIS at 63.

46. The Park Service will kill the deer – with a preference for does – until there are only 70 to 94 remaining. Accounting for new births, the Park Service estimates that 296 deer will be killed in the first three years. Most of the killing will occur in the first year when the Park Service intends to halve the population by killing 157 deer over the "over a five-month period." EIS at 64.

47. The final EIS again failed to consider the impact that its proposed action would have on "the relationship of people to the natural environment" as required by NEPA's implementing regulations – i.e., it did not consider how killing this native wildlife for the first time in the history of the Park would destroy the experience of the Park for many members of the public who go to this Park to enjoy and interact with the wildlife, particularly the deer, and to escape the rigors of city life. Rather, again, the agency stated that it would take measures to minimize the chance that the public would actually *see* or *hear* the deer being shot, by doing the

killing mostly at night and by using silencers. However, the EIS failed to consider the overall aesthetic harm that visitors will suffer knowing that native deer are being killed in an urban park; how the killing will alter the public's relationship to the Park, causing those who use the Park to curtail or even cease using it altogether, or to enjoy the Park less when they do visit; and how authorizing killing wildlife will forever change the contemplative, peaceful setting and character of this unique and special place.

48. In its Record of Decision, the Park Service again explained that even though "[d]eer density has ranged between 52 and 98 deer per square mile over the past 10 years, and current (2009) density is estimated at 67 deer per square mile," ROD at 20, and "the browse line is not prominent" in Rock Creek Park, ROD at 3, the Park Service had decided to implement Alternative D out of concern that "an unmanaged deer population *could* lead to . . . problems" in the future. ROD at 3 (emphasis added).

49. On the other hand, the Record of Decision also conceded that "[i]f an acceptable reproductive control agent becomes available sooner than expected, the park could select to use that first (before the initial sharpshooting) . . . ." ROD at 4.

50. The Park Service has told the public that it plans to begin killing deer sometime in December 2012.

**PLAINTIFFS' CLAIMS FOR RELIEF**

51. By deciding for the first time in the history of this Park to kill large numbers of native wildlife in response to what the Park Service itself characterizes as a potential *future* threat to vegetation, when less drastic approaches to controlling deer are available, the National Park Service is violating its statutory duties to "conserve the scenery and the natural and historic objects and the wild life therein," 16 U.S.C. § 1, and to "preserv[e] from injury . . . all . . .


animals . . . within [Rock Creek] park, and [retain them] in their natural condition, *as nearly as possible*," 51st Cong. § 7 (emphasis added). Accordingly, the agency's decision is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of the APA, 5 U.S.C. § 706.

52. By completely failing to consider how the wounding and killing of native wildlife will affect Washington, DC residents and Park visitors' overall enjoyment and use of the Park, the National Park Service is also violating its duties under NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. § 706.

53. These violations of law are injuring Plaintiffs in the manner described in paragraphs 3-12 above.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1. Declare Defendants in violation of the Rock Creek Park Enabling Act, the Organic Act of the National Park Service, National Environmental Policy Act, and Administrative Procedure Act;

2. Vacate and remand Defendants' Record of Decision for further consideration and explanation;

3. Preliminarily and permanently enjoin Defendants' removal of white-tailed deer by shotgun, archery, or other means, unless and until Defendants comply with the Rock Creek Park Enabling Act, the Organic Act of the National Park Service, National Environmental Policy Act and Administrative Procedure Act;

4. Award Plaintiffs their costs and attorneys' fees; and

5. Award Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Jessica Almy
(D.C. Bar No. 996921)

William S. Eubanks II
(D.C. Bar No. 987036)

Katherine A. Meyer
(D.C. Bar No. 244301)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, DC 20009
(202) 588-5206
Fax (202) 588-5049
jalmy@meyerglitz.com
beubanks@meyerglitz.com
kmeyer@meyerglitz.com

Dated: October 25, 2012