## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAROL GRUNEWALD, et al.**,<br><br>Plaintiffs,<br><br>v.<br><br>**JONATHAN B. JARVIS, DIRECTOR, NATIONAL PARK SERVICE, et al.**,<br><br>Defendants. | Civil Action No. 12-cv-1738 (RLW) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs—five Washington, DC residents and an animal rights organization—have sued the National Park Service and Department of the Interior over a plan to reduce the deer population in Washington, DC's Rock Creek Park that will likely involve shooting and killing deer either with guns or with bows and arrows. Plaintiffs claim that the government, in developing its plan, failed to comply with the laws establishing the Park itself and the Park Service, as well as the National Environmental Policy Act, and bring this action under the Administrative Procedure Act. Moreover, the Plaintiffs are concerned that implementation of the plan would turn the Park "into a killing field." (Dkt. No. 1, at 2). The parties have both moved for summary judgment, and the case is now ripe for a decision. Based upon the Court's review of the Administrative Record, the parties' briefs, the relevant law, and the arguments of counsel during the hearing held on March 4, 2013, and for the reasons stated below, the Defendants' Motion for Summary Judgment (Dkt. No. 18) is **GRANTED** and Plaintiffs' Motion for Summary Judgment (Dkt. No. 13) is **DENIED**.

I.      **Factual Summary**

   A.      **Management of National Parks**

In 1890, before the National Park Service existed, the federal government created one of the first federal parks in the nation in Washington, DC.  See Rock Creek Park Enabling Act, Ch. 1001, 26 Stat. 492 (1890).  Additional land has been set aside and added to the park since that time, and the whole area is commonly referred to as Rock Creek Park.  (See AR 16488-93).  The final section of the Enabling Act states that the park:

> shall be under the joint control of the Commissioners of the District of Columbia and the Chief Engineers of the United States Army, whose duty it shall be, as soon as practicable, to lay out and prepare roadways and bridle paths, to be used for driving and for horseback riding, respectively, and footways for pedestrians; and whose duty it shall also be to make and publish such regulations as they deem necessary or proper for the care and management of the same.  Such regulations shall provide for the preservation from injury or spoliation of all timber, animals, or curiosities within said park, and their retention in their natural condition, as nearly as possible.

Ch. 1001, § 7, 26 Stat. 492 (1890).  "Thus, from its inception Rock Creek Park became a landscape that combined the conservation and recreational missions of the wilderness preserve and urban park."  (AR 776).

Around 26 years later, Congress passed legislation that the President signed establishing the National Park Service.  The statute, known as the Park Service's Organic Act, states that the newly formed agency "shall promote and regulate the use of the Federal Areas known as national parks . . . by such means and measures as conform to the fundamental purpose of the said parks . . . which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.  Such "means

and measures" include, at the discretion of the Secretary of the Interior, "the destruction of such animals and of such plant life as may be detrimental to the use of any of said parks . . . ." Id. § 3.

Congress later clarified the relationship between a park's enabling statute and the Park Service's Organic Act. Congress provided that the various national parks, "though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage . . . and administration of these areas . . . shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress." Id. § 1a-1. As the Chief Judge of this court has stated, "as Congress has delegated the administration and preservation of national park resources to Interior and the Park Service, these agencies enjoy broad discretion in implementing their statutory responsibilities under the authorizing statutes." Edmonds Inst. v. Babbitt, 93 F. Supp. 2d 63, 69 (D.D.C. 2000) (citations omitted). And as the Supreme Court has noted, "the complete power that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there." Kleppe v. New Mexico, 426 U.S. 529, 540-41 (1976) (internal quotation marks and citation omitted).

The National Environmental Policy Act ("NEPA"), enacted in 1970, is a broad and far reaching statute that impacts the government's actions not just with respect to national parks, but to all major environmental actions. See 42 U.S.C. §§ 4321-4370f. NEPA requires the preparation of an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." Id. § 4332(2)(C); 40 C.F.R. § 1501.4. If a federal agency determines that an EIS is necessary, the resulting document must detail the "environmental impact of the proposed action," "any adverse environmental effects

which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332. The EIS must include environmental effects of a decision, whether direct, indirect, or cumulative. See 40 C.F.R. § 1508.25(c). An agency's ultimate decision must identify all alternatives considered, and "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." Id. § 1505.2. In addition, NEPA contemplates a role for the public "in both the decisionmaking process and the implementation of that decision." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). In a NEPA challenge, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97-98 (1983) (citation omitted). "NEPA merely prohibits uninformed—rather than unwise—agency action." Robertson, 490 U.S. at 351.

### B.      Information about Rock Creek Park

Rock Creek Park spans approximately 2,100 acres, and consists of forest, creek, and various landscaped areas. (See AR 16484-86, 16492). Approximately 2 million people visit the Park each year. A variety of wildlife lives in the park, including white-tailed deer, raccoons, foxes, squirrels, and chipmunks. (AR 16489). In total, scientists believe there are 36 species of mammals, 181 species of birds, and 19 species of reptiles and amphibians present in the park. (Id.).

Not long ago, it appears that Rock Creek Park may have had no deer. When the federal government established Rock Creek Park in 1890, there were "probably" no deer in the Park. (See AR 10208 ("Deer populations in the Piedmont were probably extirpated by the late 1800s.")). But deer eventually began to return. In the decade of the 1960s, when deer were first

spotted again, observation records from Park staff indicate only four sightings of deer.  (See AR 16495).  By the early 1990s, however, "deer sightings were so prevalent that that observation cards were no longer completed."  (AR 16495).  As of 2009, the Park Service estimated that Rock Creek Park currently had 67 deer per square mile, thus approximately 314 deer.  (See AR 16497).

Deer are herbivores that eat food found anywhere between the ground and up to about six feet in height.  (See AR 20043).  When there are too many deer, a visible browse line can be detected "at approximately six feet above the ground below which most or all vegetation has been uniformly browsed."  (Id.).  The "Rock Creek Park Final White-Tailed Deer Management Plan" includes a photograph with a caption noting that "[d]eer have browsed a considerable amount of the understory at Rock Creek Park."  (AR 16495).

Since the Park implemented distance sampling, believed to be the most accurate method for determining the population of deer in the Park, the number of deer has fluctuated between 60 and 98 deer per square mile.  (AR 16497).  "Research has shown that deer density in excess of 18 deer per square mile of forest has devastating consequences on regeneration."  (AR 20775).  For Rock Creek Park, scientists have estimated that a deer density of fifteen to twenty deer per square mile is one that would best balance having and maintaining a viable deer population while also allowing the Park's forest to naturally regenerate.  The scientists behind this estimation of fifteen to twenty deer per square mile referred to it as "an initial goal, meaning it should be adjusted during the life of the plan based on the findings of the vegetation monitoring to ensure that the management goals are met."  (AR 10228).

Scientists have also been conducting research on the health of vegetation in Rock Creek Park for over twenty years.  Data reveal several significant changes over that time.  For example,

tree and shrub cover less than two meters (about 6.5 feet) decreased from 46.24% cover in 1991 to 13.90% in 2007.  (AR 12685).  In addition, scientists have recommended a 67% seedling stocking rate as necessary for proper forest regeneration.  (AR 20739).  By 2007, the stocking rate as measured in Rock Creek Park had fallen to 2.26%.  (AR 16498).

There is no doubt that Rock Creek Park faces more than one threat to its ecological health.  For example, and as particularly relevant in this litigation, exotic species are a problem in park management generally, and Rock Creek Park is no exception.  The exotics problem in Rock Creek Park "was recognized as early as the 1970s."  (AR 5299).  Research conducted in the late 1990s in the Park and summarized in a report published in 2000 referred to the problem as "the most serious natural resource management problem in Rock Creek Park" and a "top management priority."  (AR 3596-97). The source of many of the most aggressive exotic plants is "landscaped private properties" abutting the Park.  (AR 3596).  In 2004, the Department of the Interior published a draft version of an "Invasive Exotic Plant Management Plan."  (AR 5297-5386).  The 2004 report notes that, although "total eradication [of exotic plants] is an unrealistic goal," Park "staff have implemented an exotics management program."  (AR 5300-01).  As part of their research, Park staff installed deer exclosures "to directly determine the effects of deer on the forest.  These will be used within the exotics program to estimate whether and how deer impact exotic plant populations."  (AR 5306).  Another mention of deer in the 2004 report occurs when talking about the invasive plant Japanese Barberry; it states that "infestations [of Japanese Barberry] will increase in size, density and number, possibly aided by the park's large whitetail deer population."  (AR 5338).  The Park noted the problem with exotics again in a 2005 General Management Plan.  It stated that because a program underway to treat the exotics problem with herbicides is only "in a limited portion of the park," "control efforts are not able to keep pace

with the rate of invasive plant introduction and spread.  Management of invasive species will be a continuous need in the park and operational plans will be updated as control strategies and funding evolve."  (AR 18773).

###### C.    Development of the Final Environmental Impact Statement ("FEIS")

As part of a NEPA planning process, in 2005 Rock Creek Park staff convened a Science Team that "evaluated scientific literature and research on the topic of deer management; established a monitoring protocol for park deer populations and other park resources; and recommended resource thresholds at which deer management strategies would be implemented." (AR 17171).  In September 2006, the Park Service published a notice in the Federal Register regarding the agency's intent to prepare a "White-tailed Deer Management Plan Environmental Impact Statement, Rock Creek Park, Washington, DC."  (AR 9020-21).

To address concerns about the impact of deer, the Park Service prepared a draft Environmental Impact Statement ("DEIS") and published it in 2009.  While acknowledging that deer are an "important park resource," (AR 13726), the Park Service nonetheless proposed reducing the number of deer in Rock Creek Park "to support forest regeneration and to protect, conserve, and restore native species and cultural landscapes," (AR 13742).  The DEIS noted problems observed from the Park's deer population, including "a decline in tree seedlings caused by excessive deer browsing and the ability of the forest to regenerate in Rock Creek Park; excessive deer browsing impacts on the existing shrubs and herbaceous species; and deer impact on the character of the park's cultural landscapes."  (AR 13675).

In the DEIS, the Park Service focused on four options regarding deer management.  (AR 13675).  Alternative A proposed by the Park Service was to take no new action.  Alternative B was to use non-lethal actions, including fences and reproductive control agents.  Alternative C

was to use sharpshooting as well as other related methods where sharpshooting would not be appropriate.  And finally the fourth option proposed, Alternative D—which the Park Service noted was its preferred alternative—would combine the second and third options, initially using lethal methods followed by population maintenance via reproductive control, as feasible.  The Park Service made the DEIS available for public review and comment.  (AR 13675).  It received many comments from the public and interested organizations, and there is no doubt that the majority of comments received opposed killing any deer.  (See AR 17740).

Ultimately, after considering the comments received in response to the DEIS, the Park Service published an FEIS that declared its intention to implement Alternative D.  (AR 16450-17041).  It rejected Alternative A because this would result in a larger deer population, and with it more severe adverse ecological impacts.  (See generally AR 16459-67 (summarizing impacts)).  The Park Service rejected Alternative B for several reasons, including that, at this time, the technology available would reduce the deer population too slowly, thus allowing adverse impacts to persist for an unacceptably long time.  (Id.).  It rejected Alternative C because the agency felt that going forward a combination of methods might work best, and choosing to have no flexibility would unnecessarily hamper long-term management.  (Id.).  Implementation of Alternative D would result in around 70 deer in the Park after three years, the target number the Park Service plans to maintain.  (AR 16548).  The agency did state that "[i]f an acceptable reproductive control agent becomes available sooner than expected, the park could select to use that first . . . ."  (AR 17732).

### D.    Procedural History of This Litigation

Through the FEIS, the Park Service indicated it planned to begin implementation of Alternative D in December 2012, but Plaintiffs filed this action in October 2012.  (See Dkt. No.

1 at ¶ 50).  Plaintiffs' initial Complaint alleged violations by the Park Service of the Rock Creek

Park Enabling Act, the Organic Act of the National Park Service, the National Environmental

Policy Act, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-706, and sought to

"[p]reliminarily and permanently enjoin Defendants' removal of white-tailed deer by shotgun,

archery, or other means, unless and until" Defendants comply with all laws.  (Dkt. No. 1, at 17).

After the parties met and conferred, the Defendants agreed to postpone implementation of the

FEIS.  (See Dkt. No. 6).  This Court agreed to an expedited schedule on cross-motions for

summary judgment in order to have a decision before March 15, 2013.  (Id.).  Both Plaintiffs'

and Defendants' motions are now fully briefed, and the issue is ripe for decision.[1]

## II.    Motion for Summary Judgment

Neither the Rock Creek Park Enabling Act, nor the Park Service's Organic Act, nor

NEPA provides a private right of action or waiver of sovereign immunity.  Thus Plaintiffs'

claims depend on the government's waiver of sovereign immunity in the APA.  The APA

requires a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," as well as action adopted "without

observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  When ruling on summary

judgment motions in a case involving final review of an agency action under the APA, the

standard set forth in Federal Rule of Civil Procedure 56(c) does not apply because of the limited

role of the court in reviewing the administrative record.[2]  See Charter Operators of Alaska v.

Blank, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012).  Instead, summary judgment serves as a

---

[1]      In addition, Plaintiffs moved to supplement the Administrative Record in this case, which this Court denied, (Dkt. No. 26), and Plaintiffs moved to file an Amended Complaint (See Dkt. No. 15, Ex. A).

[2]      Local Rule 7(h)(1) requires that a party moving for summary judgment attach a Statement of Undisputed Facts.  In cases where judicial review is based solely on the administrative record, however, a Statement of Undisputed Facts is not required.  LCvR 7(h)(2).

mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review. See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

"[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Cottage Health Sys. v. Sebelius, 631 F. Supp. 2d 80, 90 (D.D.C. 2009) (citation omitted).  The district court must "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence." Forsyth Mem'l Hosp., Inc. v. Sebelius, 639 F.3d 534, 537 (D.C. Cir. 2011) (citing Troy Corp. v. Browner, 120 F.3d 277, 281 (D.C. Cir. 1997)).  A court must "perform a searching and careful inquiry into the facts underlying the agency's decision," but "will presume the validity of agency action as long as a rational basis for it is presented." Am. Farm Bureau Fed'n v. EPA, 559 F.3d 512, 519 (D.C. Cir. 2009) (citations and quotation marks omitted).  "The Court is not empowered to substitute its judgment for that of the agency." Davis v. Latschar, 202 F.3d 359, 365 (D.C. Cir. 2000) (citations omitted).  This is especially so in the context of matters involving complex scientific issues. See Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).

## III. Analysis

Plaintiffs make several claims in their summary judgment briefing that all fail to persuade.  First, they claim to have "demonstrated" that there is no current overpopulation of deer in Rock Creek Park.  (Dkt. No. 24, at 8).  This is flatly contradicted by the Administrative Record.  Second, they misinterpret the Park's Enabling Act to mean that killing deer should be prohibited when other options are available to reduce the deer population's size.  Third, they claim the Park Service failed to address the issue of exotic plants in the FEIS, when the

Administrative Record generally and the FEIS specifically clearly and repeatedly address concerns regarding exotics.  Fourth, they falsely claim that the Park Service failed to consider various issues about visitor enjoyment of the Park.  And finally, they claim that the Park Service did not give due consideration to alternatives to killing deer, notably reproductive controls, when the Administrative Record reveals that the Park Service considered such controls and found that they are not currently feasible for controlling the deer in Rock Creek Park.  The Court will address these issues in turn.

### A.      Size of the Deer Population

Plaintiffs state that "according to the Park Service's own records, there is no overpopulation of deer that is currently impairing any of the Park's resources . . . ."  (Dkt. No. 13, at 9).  This allegation is contradicted by the voluminous production in this case.  The FEIS and the Administrative Record repeatedly and unequivocally state that deer are currently impairing the Park.

Plaintiffs suggest that the FEIS only talks about future problems by selectively quoting portions of the FEIS that speak in the future tense.  (See, e.g., Dkt. No. 13, at 36 ("[A]n overabundance of deer in Rock Creek Park could adversely affect regeneration of vegetation in riparian areas.") (quoting AR 16508) (emphasis added by Plaintiffs)).  This unfairly represents the record.  Granted, there is language in the FEIS about the future.  But the document is forward looking, so not only is this not surprising, it is necessary.  The larger point, however, is that Plaintiffs' representation that "the deer in Rock Creek Park pose no threat to the Park now," (Dkt. No. 13, at 37) (emphasis in original), is belied by the Administrative Record and the FEIS.  One does not have to look very far to find that adverse impacts to the Park are not a thing of the future, but of the present.  "The large numbers of white-tailed deer within the park are resulting

in a substantial effect on the park ecosystem due to the deer's heavy browsing of vegetation." (AR 16457).  Not will result.  <u>Are resulting</u>.  "[D]eer are affecting the integrity of the understory structure and species composition, diminishing the value of habitat for other wildlife."  (AR 16508).  Not will affect.  <u>Are affecting</u>.  "[W]hite-tailed deer are having a detrimental effect on the structure and species richness of native plants in this forest, and as a consequence, diminishing the value of the habitat for wildlife."  (AR 9476).  Not will have.  <u>Are having</u>. Plaintiffs claim that "according to the Park Service's own records, there is no overpopulation of deer that is currently impairing any of the Park's resources . . . ."  (Dkt. No. 13, at 9).  This conclusion cannot be reached without ignoring or distorting the record.

Further, Plaintiffs ignore the conclusion of scientists that a browse line need not be prominent before a threat to Park health is imminent.  Plaintiffs rightly note that the Park Service has stated that "the browse line is not prominent at Rock Creek Park."  (Dkt. No. 13, at 16 (quoting AR 17731) (emphasis removed)).  But the quote is taken out of its context.  In full, the quote reads:  "These impacts [of significantly lower levels of vegetation] can be directly attributed to deer browsing and indicate deer are affecting the integrity of the understory structure and species composition, diminishing the value of habitat for other wildlife.  While there is some understory vegetation and the browse line is not prominent at Rock Creek Park, trends indicate that an unmanaged deer population could lead to these problems, which are currently being faced by similar eastern national parks."  (AR 17731).  Plaintiffs seem to suggest that the Park Service should not be overly concerned because the browse line is not yet prominent.  While this may be Plaintiffs' view, it is not the view held by scientists.  "Because overabundant deer can cause severe, long-term impacts that are difficult to reverse, ecologists should persuade managers to reduce deer numbers before and not after such impacts become

evident." (AR 5772).  The logic of scientists with respect to this issue has been followed by other courts as well.  See, e.g., Wilkins v. Sec'y of the Interior, 995 F.2d 850, 853 (8th Cir. 1993) (interpreting 16 U.S.C. § 3 to mean that "[the Secretary] need not wait until the damage through overbrowsing has taken its toll on the park plant life and deer herd before taking action no less than [the Secretary] would be required to delay the destruction of a vicious animal until after an attack on a person." (citation omitted)).

Plaintiffs also claim that "the Park Service's speculation about <u>future</u> harm was predicated upon a significant increase in the current deer population."  (Dkt. No. 13, at 37) (emphasis in original).  But the Park Service has stated that the deer population is too high at current levels, and is having an adverse impact now.  Because the deer population is too high now, the Park Service maintains, a significant increase in the deer population would make a bad situation worse.  Plaintiffs cite to a 1999 National Park Service fact sheet to support their argument, which states that "[e]vidence of high deer densities or heavy vegetative browsing does not necessarily mean deer are causing unacceptable harm to park resources."  (Dkt. No. 13, at 38 (quoting AR 3572) (emphasis removed)).  But Plaintiffs omit the critical sentence immediately following:  "Rather, park managers must determine that deer are impairing the park's ability to achieve management objectives and reach goals."  (AR 3572).  That is exactly what the Park Service has done with respect to Rock Creek Park.

Plaintiffs misrepresent the 1999 Fact Sheet in another way as well.  They state, "as the Park Service itself informed the public years ago, the agency must have 'scientific data on environmental conditions that suggest deer as <u>the principal cause for not achieving</u>' the Park's objectives before it may kill this wildlife . . . ."  (Dkt. No. 13, at 39 (quoting AR 3572-73)) (emphasis added by Plaintiffs).  But this is a distortion of what the Fact Sheet says.  Rather, the

Fact Sheet is answering its own question of why deer are not managed in all parks even though there may be high deer densities.  The answer provided is that deer are not managed in all parks "either because specific goals have not been identified and objectives of natural-resource managers have not been quantified or" for the reason Plaintiffs cite.  (AR 3572-73).  Here, the Park Service has identified specific goals and objectives in its FEIS.  Plaintiffs' omission when quoting this Fact Sheet alters its meaning.

Plaintiffs claim that the science relied upon by the Park Service "clearly" "cannot identify deer, to the exclusion of other sources . . . as the cause of the unnatural decline in native plant species." (Dkt. No. 13, at n.9).  For example, they claim that a report in the record published by the National Park Service titled "Impacts of Deer Herbivory on Vegetation in Rock Creek Park, 2001-2009)," (AR 15219-59), omits data necessary to document significant impacts due to deer, (See Dkt. No. 13, at n.9).  This misses a major point of the study, however:  the deer are having negative impacts on Rock Creek Park.  The report clearly and unequivocally concludes:  "Data from the first 9 years of the Rock Creek Park herbivory study indicate that deer herbivory is having significant negative impacts on forest vegetation in the park." (AR 15236).

**B.      Rock Creek Park Enabling Act & National Park Service Organic Act**

The parties dispute the meaning of the language in Section 7 of the Rock Creek Park Enabling Act.  Plaintiffs argue that because the language in the statute creating Rock Creek Park states the federal government must "preserv[e] from injury . . . all . . . animals . . . in their natural condition, as nearly as possible," that the Park Service's plan to kill deer violates the statute because other options are available to the agency.  Defendants, meanwhile, argue the statute does not limit the agency from killing deer despite the alleged availability of other options.  To

resolve this dispute over the meaning of the statute, the familiar language from <u>Chevron, U.S.A.,</u>

<u>Inc. v. Natural Resources Defense Council, Inc.</u>, helps guide the analysis:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842-43 (1984) (footnotes omitted).  Under <u>Chevron</u> step one, if the statute is clear

and unambiguous, the analysis for the court ends, and that clear and unambiguous Congressional

language controls.  If that is not the case, the analysis shifts to <u>Chevron</u> step two, whereby a

"court must defer to the agency's interpretation so long as it is reasonable, consistent with the

statutory purpose, and not in conflict with the statute's plain language."  <u>Coal Emp't Project v.</u>

<u>Dole</u>, 889 F.2d 1127, 1131 (D.C. Cir. 1989).

    Plaintiffs argue that the language to protect animals "as nearly as possible" is

incompatible with killing deer when other options are available.  Plaintiffs repeatedly quote the

"as nearly as possible" language throughout their summary judgment brief.  (<u>See</u> Dkt. No. 13, at

11, 12, 35, 36 n.8, 39, 41).  But context matters.  The Enabling Act does not direct the

government to protect animals "as nearly as possible" in every situation, no matter what.

Instead, the language comes in the following sentence:  "Such regulations shall provide for the

preservation from injury or spoliation of all timber, animals, or curiosities within said park, and

their retention in their natural condition, as nearly as possible."  Ch. 1001, § 7, 26 Stat. 492

(1890). Determining when the Park Service shall preserve animals "as nearly as possible," then, pursuant to the Enabling Act, requires an understanding of the reference to "[s]uch regulations."

The regulations referred to are found in the previous sentence of the statute, and do not clearly refer to deer management. There, the statute states that the government has the duty to "lay out and prepare roadways and bridle paths, to be used for driving and for horseback riding, respectively, and footways for pedestrians; and whose duty it shall also be to make and publish such regulations as they deem necessary or proper for the care and management of the same. Such regulations . . . ." Ch. 1001, § 7, 26 Stat. 492 (1890) (emphasis supplied). Deference to a park's Enabling Act is proper when it "directly and specifically" speaks to issues contrary to the "values and purposes" of the broader national park system. See 16 U.S.C. § 1a-1. When speaking of preservation "as nearly as possible," Congress did so in the context of laying out of roads and paths. This is not related to deer management, and thus falls outside of Chevron step one when trying to determine its application to deer management.

Plaintiffs take issue with this analysis in their Reply Brief, but they miss the mark. The issue at Chevron step one is whether Congress has "directly spoken" to the "precise question at issue." In their summary judgment brief, Plaintiffs make their own Chevron step one argument, claiming that the Park's Enabling Act is a "command" that "requires the agency to refrain from killing the native wildlife in the Park unless it has no other option available to preserve the other resources of the Park." (Dkt. No. 13, at 35). Defendants responded by arguing that Congress had not spoken to this issue directly; that is, the Enabling Act does not clearly set out how the Park should manage resources to maintain a natural condition, nor did Congress define "as nearly as possible." (See Dkt. No. 18, at 40-44). Yet Plaintiffs criticized the agency's position by citing cases that deal with Chevron step two. (See Dkt. No. 24, at 12-13 (citing Defenders of

Wildlife v. Norton, 258 F.3d 1136, 1141 (9th Cir. 2001), which calls the statute at issue in that case "inherently ambiguous," and S. Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 827 (10th Cir. 2000), which notes "we cannot resolve the issue before us under step one of Chevron; instead we must reach step two.")).  Also, Plaintiffs are incorrect when they claim that Defendants have offered an interpretation of the Enabling Act inconsistent with prior agency action.  Plaintiffs have made no demonstration, nor could they, that the Park Service has ever represented that the Enabling Act prohibits the culling of one species of animal so as to protect other plant and animal species in the Park.

Because the language in Section 7 of the Park's Enabling Act does not speak directly to deer management, the analysis proceeds to Chevron step two:  "whether the agency's [action] is based on a permissible construction of the statute."  467 U.S. at 843.  Because the Enabling Act does not speak directly to the issue of deer management, and thus does not conflict with the Park Service's Organic Act, the agency's interpretation of the Enabling Act to require a balanced approach to protecting all animals and vegetation in the park is permissible.  The FEIS is designed to maintain a population of white-tailed deer in balance with other resources.  This accords with the language of the Enabling Act, which refers to the preservation of all timber and animals, not just some.  Thus, the Park Service's interpretation is entitled to deference.

The Park Service's interpretation of the Enabling Act makes even more sense when viewed in conjunction with the agency's Organic Act.  Congress' lack of explicit instruction with respect to deer management in the Enabling Act—no surprise given that deer likely did not exist in the Park when Congress passed the statute—further clarifies that Congress vested the Park Service with discretion under the Organic Act "to conserve the scenery and the natural and historic objects and the wildlife therein . . . in such manner and by such means as will leave them

unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.  In one sense, this language

is analogous to Section 7 of the Park's Enabling Act.  But it is modified in a critical way:  the

Organic Act provides, at the discretion of the Secretary of the Interior, "for the destruction of

such animals and of such plant life as may be detrimental to the use of any . . . parks . . . ."  16

U.S.C. § 3.  Courts have frequently found this authority allows the Park Service to reduce deer

populations.  See, e.g., Davis v. Latschar, 83 F. Supp. 2d 1 (D.D.C. 1998), aff'd 202 F.3d 359

(D.C. Cir. 2000); Friends of Animals v. Caldwell, No. 2:09-cv-5349, 2010 WL 4259753 (E.D.

Pa. Oct. 27, 2010).

In Plaintiffs' summary judgment motion, they allege Defendants violated NEPA and the

Park's Enabling Act, but do not allege a violation of the National Park Service's Organic Act.

Although Plaintiffs' Complaint alleges a violation of the Organic Act, their summary judgment

motion contains two argument sections:  one on an alleged violation of the Enabling Act, and the

other on alleged violations of NEPA.  The only mention of the Organic Act is a blatant

misrepresentation that "the Park Service fail[ed] even to invoke Section 3 of the organic statute

as the basis for killing the deer."  (Dkt. No. 13, at 41 n.11).  This is simply not true.  Not only

does the FEIS cite and quote 16 U.S.C. § 3, (AR 16493), but the agency notes that "[i]n defining

this discretion, the 10th Circuit Court of Appeals overturned a district court decision, holding in

part that the NPS 'need not wait until the damage through overbrowsing has taken its toll on park

plant life . . . before taking preventative action.'  N.M. State Game Comm'n v. Udall, 410 F.2d

1197, 1201 (10th Cir. 1969).  "This discretion has been reinforced over time."  (Id.).

Although not addressed in their initial brief, Plaintiffs seek to revive their Organic Act

argument in their Opposition/Reply brief.  (Dkt. No. 24, at 30-33).  In so doing, their argument

focuses on whether the government failed to account for the possibility that shooting and killing

deer would "diminish opportunities for current or future generations to enjoy . . . or be inspired by park resources or values." (Dkt. No. 24, at 31 (quoting AR 7606) (emphasis removed)). This is essentially a repackaging of one of Plaintiffs' NEPA claims, as discussed below. As a matter of civil procedure, Plaintiffs have waived any Organic Act argument. See, e.g., Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); see also John C. Flood of Va., Inc., v. John C. Flood, Inc., 700 F. Supp. 2d 90, 96 n.4 (D.D.C. 2010), aff'd, 642 F.3d 1105 (D.C. Cir. 2011) (rejecting theories not raised in summary judgment motion "even if alluded to in the Complaint"). Although this Organic Act claim need not be considered because it is not properly before the Court, the claim would fail anyway because the government did account for the considerations raised by Plaintiffs when it explained how it would seek to minimize the impact of its activity by acting when visitation was low, using noise suppression technology, and other methods. (AR 16732). This same issue is discussed, properly, in the Court's NEPA analysis.

## C.  National Environmental Policy Act ("NEPA")

### 1.  Nonnative, Exotic Plants

NEPA requires that an agency identify the purpose and need for action. See 40 C.F.R. § 1502.13. The Park Service identified eleven objectives of the FEIS. (AR 17730). It stated the purpose was "to develop a white-tailed deer management strategy that supports long-term protection, preservation, and restoration of native vegetation and other natural and cultural resources in Rock Creek Park." (AR 17729). Plaintiffs do not offer any serious challenge to the agency's purpose or objectives. Given that courts evaluate agency objectives "with considerable deference to the agency's expertise and policy-making role," City of Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999), and the lack of significant debate on this point, this Court finds

that the Park Service's objectives are reasonable, see Theodore Roosevelt Conservation P'ship v.

Salazar, 744 F. Supp. 2d 151, 161 (D.D.C. 2010).  In addition, the government notes it examined

a wide range of direct and indirect impacts of Alternative D, including impacts on "vegetation;

soils and water quality; wetlands and floodplains; wildlife and wildlife habitat; rare, unique,

threatened, or engendered species; cultural landscapes; soundscapes; visitor use and experience;

visitor and employee safety; [and] socioeconomic resources."  (Dkt. No. 18, at 63 (citing AR

17318-427)).   This list, and the analysis of these issues in the FEIS, indicates that the

government took the requisite "hard look" at the potential consequences of its proposed action,

as required by NEPA.  See Robertson, 490 U.S. at 350.  But there is one item in particular left

off this list that Plaintiffs challenge.

A major criticism Plaintiffs offer with respect to Defendants' compliance (or, in their

view, lack thereof) of NEPA is that the government failed to consider the management of deer in

conjunction with the Park's problems with exotic species.  The government argues initially that

Plaintiffs' NEPA argument with respect to exotic species is not properly before this Court

because Plaintiffs failed to make the government aware of the issue.  (Dkt. No. 18, at 65).  On

this point, the government's argument is rejected.  The government cannot legitimately claim

surprise that properly dealing with the issue of exotic species formed an important part of the

FEIS.  For example, the index of the FEIS includes 31 entries for "exotic plant."  (See AR

17039).  The import of the issue should not have been lost on the government.  Thus two

questions remain:   did the government need to address exotics and deer management

simultaneously, and did they properly address exotics in the FEIS.

First is the issue of whether the government needed to address exotics and deer

management simultaneously.  Plaintiffs are correct that multiple actions are to be considered

together in certain circumstances.  See 40 C.F.R. §§ 1508.25(a)(1)-(a)(3).  But the fundamental

flaw with Plaintiffs' argument is that it goes against longstanding precedent that "[a]n agency

enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of

procedures and priorities."  Mobil Oil Exploration & Producing Se. Inc. v. United Distribution

Cos., 498 U.S. 211, 230 (1991) (citations omitted).  It is "absolutely clear" that agencies are free

to engage in multiple rulemakings at their discretion "[a]bsent constitutional constraints or

extremely compelling circumstances."  Vt. Yankee Nuclear Power Corp. v. Natural Res. Def.

Council, Inc., 435 U.S. 519, 543 (1978) (citations omitted).  "[A]n agency need not solve every

problem before it in the same proceeding.  This applies even where the initial solution to one

problem has adverse consequences for another area that the agency was addressing."  Mobil Oil,

498 U.S. at 231 (citing Vt. Yankee, 435 U.S. at 543-44).  As stated by the Ninth Circuit and

perfectly on point here, a court "cannot force an agency to aggregate diverse actions to the point

where problems must be tackled from every angle at once.  To do so risks further paralysis of

agency decisionmaking."  Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv., 56 F.3d 1060,

1069 (9th Cir. 1995) (citation omitted).  Thus it is perfectly acceptable for the agency to

conclude that "[t]he plan/EIS for deer management is an example of an implementation plan that

focuses on deer management and not invasive plant management.  These two subjects, although

in some ways related, are addressed in two different planning efforts."  (AR 16871).

        The cases cited by Plaintiffs are not to the contrary.  For example, Plaintiffs cite to

Kleppe v. Sierra Club, 427 U.S. 390 (1976), multiple times in their summary judgment brief.

(See Dkt. No. 13, at 14 & 42).  Both times they quote the opinion for the proposition that the

exotics and deer issues must be handled together,[3] they use the same sentence, and omit the same

---

[3]        The Kleppe opinion is cited elsewhere in the brief for other propositions.

compound adjective.  The sentence, as included by Plaintiffs, is that "[w]hen several proposals

for . . . actions that will have a cumulative or synergistic environmental impact upon a region are

pending concurrently before an agency, their environmental consequences must be considered

together."  (Id. (citing Kleppe, 427 U.S. at 410) (Plaintiffs' emphasis removed)).  First of all, the

opinion refers not to proposals generally, as Plaintiffs represent, but to "proposals for coal-

related actions."  Kleppe, 427 U.S. at 410.  This changes the meaning considerably, because the

Court is not talking about just any proposals.  But even more important, in Kleppe, where coal-

related actions were at issue, the Supreme Court still rejected the NEPA challenge, finding that

where resolving issues "requires a high level of technical expertise," it "is properly left to the

informed discretion of the responsible federal agencies."  Kleppe, 427 U.S. at 412.  Thus the case

in fact supports Defendants' position.

Plaintiffs also rely on Fund for Animals v. Clark, 27 F. Supp. 2d 8 (D.D.C. 1998).  In fact

this is a case upon which Plaintiffs principally rely.  (See Dkt. No. 24, at 4).  But this case is of

little help.  In Fund for Animals, the court found that federal agencies failed to consider two

related actions where one had a profound impact on the other and the record was clear the

agency did not consider the combined impact.  27 F. Supp. 2d at 14.  The court criticized the

agencies for failing to consider animal feeding and management programs together "so that the

involved agencies could determine the combined impact of the programs.  The record is clear

that the [Environmental Assessment] submitted . . . does not consider the combined

environmental impact of these . . . actions."  Id.  In sum, the issue is not whether inextricably

linked issues can be separated by agencies in an EIS.  The issue is whether subjects that have a

more peripheral relationship, such as deer and exotics, can be managed with awareness of both

subjects without halting the ability of the agency to handle either.  As articulated by the court in

Fund for Animals, an agency may address different issues at different times; what it may not do is "unreasonably" "segment actions."  27 F. Supp. 2d at 13.  The Park Service here does not unreasonably segment actions under NEPA when "park staff have implemented an exotics management program," (AR 16506), as well as when scientific research indicates adverse impacts from deer requires action.

Second is the issue of whether the government properly addressed the subject of exotics in the FEIS.  Section II.A of Plaintiffs' summary judgment motion is titled "The Park Service Has Violated NEPA By Failing To Address The Invasive Species Problem As Part Of Its Management Decision."  But in that very section of Plaintiffs' brief, they acknowledge that one of the objectives of the FEIS is to "reduce the spread of nonnative plant species through effective deer management."  (See Dkt. No. 13, at 43 (quoting AR 16456)).  Anyone reviewing the FEIS does not have to read far before the subjects of deer management and exotics are discussed together:  there are five mentions of the two subjects in the first two pages.  (See AR 16456-57 (objectives of deer management plan include to:  "[p]rotect the natural abundance, distribution, and diversity of native plant species"; "[m]aintain, restore, and promote a mix of native plant species and reduce the spread of nonnative plant species through effective deer management"; "[p]rotect the natural abundance, distribution, and diversity of native animal species within the park by reducing excessive deer browsing, trampling, and nonnative seed dispersal"; "[p]rotect habitat of rare plant and animal species from adverse effects of deer, such as excessive deer browsing, trampling, and nonnative seed dispersal"; "[p]rotect the integrity, variety, and character of the cultural landscapes by reducing excessive deer browsing, trampling, and nonnative seed dispersal").  The Table of Contents includes sections on "Exotic Invasive Species" and "Exotic Invasive Species in Rock Creek Park."  (AR 16471).  It is thus difficult to

square Plaintiffs' claim that the agency ignored the issue of exotics in the FEIS, especially when Plaintiffs themselves acknowledge that the agency explicitly discussed the issue.

The record is replete with examples of Defendants addressing the problem with exotics in Rock Creek Park, and considering the issue along with the issue of deer management.   For example, the Science Team assembled by the Park Service concluded "that deer reduction must occur first and then the management of invasive species would need to be evaluated to determine if they limit the recovery of the native habitat."  (AR 10230).  The FEIS states that "[a] continued large deer population and related browsing [would] result[] in decreased plant diversity [and] increased exotic plants . . . ."  (AR 16462).   It also states that "overbrowsing by deer gives invasive exotic plant species an opportunity to become established, which could potentially outcompete native plants and contribute to adverse impacts to visitors who value native vegetation."  (AR 16729).   It adds that "[d]eer can promote nonnative species through habitat alteration (disturbance to vegetation and soils from trampling) and through seed dispersal from seeds carried on their coats or found in fecal matter."  (AR 16590) (citations omitted).   And the list goes on.   One simply cannot reconcile Plaintiffs' claim that Defendants failed to address deer management and exotics together with the Administrative Record.  Plaintiffs relatedly argue that the Park Service violated NEPA by failing to consider whether reducing the number of deer at Rock Creek Park may promote the spread of exotic species.   (See Dkt. No. 13, at 45-48).   But Plaintiffs point to nothing in the record to suggest that reducing the number of deer may increase the spread of exotics.   In fact, the Administrative Record suggests the exact opposite.

Plaintiffs call the Park Service's alleged failure not to address exotics in the context of the FEIS's objectives to protect, preserve, and restore native vegetation "[m]ost startling."  (Dkt. No. 13, at 32).   The Plaintiffs contend that "the Park Service failed to consider the impact that

killing the deer may have on <u>promoting</u> the expansion of exotic species into the Park.   This omission is particularly glaring in light of the fact that the Park Service emphasized the <u>beneficial</u> 'socio-economic' impacts its decision to kill the deer will have on the private properties that surround the Park as part of its environmental analysis."   (Dkt. No. 13, at 32) (citations omitted) (emphasis in original).   But the Administrative Record reveals that in fact the Park Service did consider this issue.   For example, the Science Team assembled by the Park Service stated:   "Deer typically have not shown any preference for the invasive species; they seem to prefer the native plants in Rock Creek Park.   Therefore, the Science Team deduced that <u>decreased deer density would not directly result in increased invasive species</u>."   (AR10230) (emphasis added).   In addition, research published in 2011 appearing in the Administrative Record states:   "Protection of vegetation from deer herbivory appears to have had virtually no impact on non-native species richness."   (AR 15236).   Thus Plaintiffs' argument that the Park Service did not consider the impact on exotic species of lowering the deer population does not withstand scrutiny.   While the subject may not be addressed at the length Plaintiffs desire, "some degree of speculation and uncertainty is inherent in agency decisionmaking," and an "agency need not stop in its tracks when it lacks sufficient information."   <u>Oceana, Inc. v. Evans</u>, 384 F. Supp. 2d 203, 219 (D.D.C. 2005) (citations omitted).

Based on all of this, this Court is convinced that the Park Service acted within its discretion to address deer management through the FEIS without simultaneously implementing a final, detailed plan for the control of exotics.   Here the Science Team assembled by the Park Service stated:   "Deer typically have not shown any preference for the invasive species; they seem to prefer the native plants in Rock Creek Park.   Therefore, the Science Team deduced that <u>decreased deer density would not directly result in increased invasive species</u>."   (AR10230)

(emphasis added).  "The NEPA process involves an almost endless series of judgment calls. . . . It is of course always possible to explore a subject more deeply and to discuss it more thoroughly.  The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."  Coal. on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987).  There is no reason for this Court to interfere with the government's decision to manage the deer population in Rock Creek Park in accordance with the FEIS.

### 2.  Impact on Park/Visitors

NEPA requires an agency to consider "the relationship of people with their environment."  40 C.F.R. § 1508.14.  Plaintiffs claim that "the agency summarily dismissed all adverse impacts to visitors as 'negligible' simply because the killing would 'primarily occur during fall and winter and at night' and not all of the deer would be killed."  (Dkt. No. 13, at 50 (quoting AR 16734) (emphasis in original)).  But the Park Service did consider impacts on visitors to the Park.

There are several ways in which the Park Service considered visitor impacts.  For example, while acknowledging that use of methods such as sharpshooting would have some negative impacts on visitors, the Park Service considered that those would be mitigated—albeit not eliminated—by trying to do all culling at night when the Park is closed, and during the winter when there are fewer visitors.  (AR 16734).  Plaintiffs' representation that the agency dismissed all impacts as negligible is not accurate.  For example, the agency acknowledged that people close "to the source of the firearm would likely experience moderate adverse impacts if such sounds made enjoyment of other activities in the area difficult," and that "[o]verall impacts to soundscapes under [Alternatives C & D] would be short and long term, adverse, and minor to moderate, particularly due to the use of firearms."  (AR 16724-25).  Ultimately this "would be

expected to decrease in the long term, as deer populations in all affected areas decrease and the need for direct reduction decreases as well." (AR 16726). Although there would be fewer deer, certainly "opportunities to view deer would still exist." (AR 16734). And of course there is the consideration that the overall impact of Alternative D is designed to increase plant and animal diversity, thus allowing visitors to the Park to "enjoy enhanced scenery." (Id.).

Plaintiffs claim that because the Park Service failed to consider the impact using lethal force will have on the "traditional park character and visitor experience," (AR 18615), the agency violated NEPA. Plaintiffs argue, for example, that "merely knowing that wildlife is being killed each night will itself generate extremely negative impacts." (Dkt. No. 13, at 49). But "merely knowing" about what is happening to wildlife is a psychological injury not cognizable under NEPA. See Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir. 1992); see also Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989) ("[T]he harm at stake in a NEPA violation is a harm to the environment, not merely to . . . psychological well-being.") (emphasis removed). There is no logical end to the argument advanced here by Plaintiffs; presumably there are members of the public for whom merely knowing that wildlife is being subjected to reproductive controls may generate negative impacts. This is not the type of injury NEPA is designed to protect. Moreover, Defendants considered and weighed the issue as part of their overall decisionmaking.[4] Thus the cases cited by Plaintiffs are of little help. For example,

---

[4]     Plaintiffs argue that the failure to conduct a visitor use study specific to this plan violates NEPA because the government therefore did not consider how the deer management plan will impact Park use. But the government does have an understanding of what people particularly value in Rock Creek Park from a previous study conducted in 1999 that "assessed why visitors came to the park, what was important to them at the park, what were their perceptions of the park, and how they rated park amenities." (AR 16629). In addition, "[m]ore specific visitor studies have been done in other parks to look at visitors' and residents' perceptions of deer," (AR 16903), and the Park Service rationally "believes that it is not unreasonable to make assumptions

Plaintiffs cite <u>Bluewater Network v. Salazar</u>, 721 F. Supp. 2d 7 (D.D.C. 2010), but even Plaintiffs themselves note that in <u>Bluewater Network</u> there was "no discussion" in the NEPA document about the impact of changing course and allowing watercraft back into two national parks. (<u>See</u> Dkt. No. 24, at 49). Such is not the case here, as previously discussed.

### 3. Reproductive Control Methods

The Park Service developed a set of five criteria to determine whether a reproductive agent would be appropriate for use in Rock Creek Park to manage the deer population. The agent must: be federally approved for free-ranging populations; be effective for three to five years; be able to be administered remotely; allow the meat to remain safe for human consumption; and have demonstrated its efficacy in a free-ranging population with limited behavioral impacts. (AR 17734-35). Plaintiffs suggest that reproductive controls would be a preferable method for controlling deer than the Park Service's Alternative D. (<u>See</u> Dkt. No. 13, at 40). Their argument is based primarily on the claim that such controls have been used to control deer populations in other areas. (<u>Id.</u>). They also state in a footnote that "the mere fact that some reproductive control agents lack federal approval is not a legitimate basis for rejecting this approach." (<u>Id.</u> at 40 n.10).

While reproductive controls may hold promise for the future, the Administrative Record supports the Park Service's conclusion that such controls are inadequate to meet the Park's needs now. Research analyses in the Administrative Record indicate that immunocontraceptive agents can be effective at maintaining wild animal populations, but not, as is relevant here, reducing such populations, particularly deer. (<u>See</u>, <u>e.g.</u>, AR 14821-36; AR 13166-93; AR 4603-38). One study in the record found that "for long-lived species like deer, it may be prudent to reduce the

---

about visitor experiences when similar studies have been completed in national park areas," (AR 16905).

population to a desired number by some other management technique before applying fertility control to stabilize herd growth." (AR 14828). Another called their use on deer herds such as those found in Rock Creek Park "impractical and ineffective. Because fertility control has no short-term effect on population size, pre or post treatment culling will be an essential part of the timely resolution of deer problems with fertility agents." (AR 13185). Yet another found that for "white-tailed deer, which have a low reproductive rate and life span from 10 to 12 years, fertility control alone will probably not be effective in reducing the population. . . . From a practical standpoint, it would be better to reduce the deer herd to a desired number by some other management technique, then apply fertility control to stabilize herd growth." (AR 4613 (citation omitted)). The Administrative Record here amply supports Defendants' decision not to rely solely on reproductive controls to address the deer management issue.

Plaintiffs point to research studies that purportedly support their argument in favor of preferring reproductive controls over Alternative D, but upon closer examination this support fades. For example, Plaintiffs state that one type of reproductive control "has been successfully used at Assateague Island National Seashore to reduce the wild horse population." (Dkt. No. 13, at 24 n.5). But Plaintiffs fail to note the data at issue: the study reveals it took fifteen years to reduce the population by 16%. (See AR 16796). This math, as applied to Rock Creek Park, fails to address the problem as scientists have recommended both in terms of the speed and amount of necessary population reduction. Two other studies cited by Plaintiffs, which looked at a small segment of fenced deer populations, "indicate that the amount of reduction in deer density needed to achieve the desired forest regeneration would take a long time to occur, and forest regeneration would not be successful within the life of this plan." (AR 16837). Another study cited by Plaintiffs involved fenced deer at a zoo who were surgically sterilized. (AR 16538). All

of this research is either inapposite, or affirms that relying solely on reproductive controls is not currently feasible.

<u>CONCLUSION</u>

Nature is dynamic and ever-changing.   When Congress passed the Rock Creek Park Enabling Act in 1890, they could hardly have imagined a deer population causing problems in the Park, given the likely absence of the animal in the Park.   Yet the Park Service is now faced with a difficult decision.   The deer population in the Park is above what scientists have concluded is healthy for the long-term management of the Park.   There appears to be little dispute that a decision must be made about what to do, and people understandably have strong views about the right course.   But the role of this Court is not to decide that course.   That is a role that Congress has entrusted to the Park Service.   As the Supreme Court has explained, "[t]he question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise," <u>Marsh</u>, 490 U.S. at 376, and the review of complex scientific information is when a court should be "most deferential," <u>Balt. Gas & Elec. Co.</u>, 462 U.S. at 103.   Plaintiffs do not offer argument to justify withholding deference to the Park Service's reasoned decisionmaking in this case.   Accordingly, Defendants' motion for summary judgment (Dkt. No. 18) is granted, and Plaintiffs' motion for summary judgment (Dkt. No. 13) is denied.   An Order accompanies this Memorandum.

Date:  March 14, 2013

                                                _____
                                                ROBERT L. WILKINS
                                                United States District Judge